Affirmed and Opinion filed November 1, 2007








Affirmed and Opinion filed November 1, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00062-CV

____________

 

PETER ELLOWAY, On Behalf Of Himself
and All Others Similarly Situated, Appellant

 

V.

 

DONNA C. PATE, In Her Capacity As
Independent Executor of the Estate of JAMES L. PATE, JAMES J. POSTL, TERRY L.
SAVAGE, H. JOHN GREENIAUS, BRENT SCOWCROFT, LORNE R. WAXLAX, FORREST R.
HASELTON, C. BERDON LAWRENCE, and GERALD B. SMITH, Appellees

 



 

On Appeal from the 295th
District Court

Harris County, Texas

Trial Court Cause No. 2002-16085

 



 

O P I N I O N








This is a shareholder class action brought by, appellant,
Peter Elloway, on Behalf of Himself and All Others Similarly Situated, against
appellees, Donna C. Pate, In Her Capacity As Independent Executor of the Estate
of James L. Pate, James J. Postl, Terry L. Savage, H. John Greeniaus, Brent Scowcroft,
Lorne R. Waxlax, Forrest R. Haselton, C. Berdon Lawrence, and Gerald B. Smith,
for the alleged breach of their fiduciary duties in connection with the
acquisition of Pennzoil-Quaker State Company (APennzoil@) by Shell Oil
Company (AShell@).  We affirm.

                                                  Background

James Postl was president and chief executive officer of
Pennzoil and a director of Pennzoil.  James Pate was chairman of Pennzoil=s Board of
Directors and chairman of the executive committee.  Terry Savage, John Greeniaus,
Brent Scowcroft, Lorne Waxlax, Forrest Haselton, Berdon Lawrence, and Gerald
Smith were members of Pennzoil=s Board of Directors (the ADirectors=).  

On February 22, 2002, Rob Routs, President of Shell Oil
Products US, approached Jim Postl with a cash offer for Shell to purchase
Pennzoil for the price of $18.50 per share.  Postl informed Routs Pennzoil was
not for sale and it was committed to, and confident in, its five-year strategic
plan.  However, Postl told Routs he would take the offer to Pennzoil=s board.  On March
5, 2002, Postl took the offer to board, which agreed that the price was not
adequate, but authorized Postl to have further discussions with Shell Ato see if a
transaction could be negotiated that would be in the best interests of the
Company=s stockholders.@  

Postl also informed the board that he would engage the
investment banking company Morgan Stanley.  On March 7, 2002, Postl entered
into an agreement for Morgan Stanley to provide Pennzoil with financial advice
and assistance in connection with the proposed Shell/Pennzoil merger.  In the
event the sale did not go through, Morgan Stanley would receive an advisory fee
of $100,000.  If the sale of the company was accomplished, Morgan Stanley would
receive a transaction fee to be calculated as A0.40 % of the
transaction=s Aggregate Value.@  








Also, on March 5, 2002, a compensation committee meeting
was held.  The committee members were Forrest Haselton, Terry Savage, and John
Greeniaus.  The compensation committee approved several amendments of the
company=s benefits in the
event of a change in control:[1] 


amend the company=s executive severance plan with
regard to a change in control of the company; 

amend Pate=s agreement to provide for coverage
under Pennzoil=s senior executive severance plan
so that if a change in control of the company occurred, Pate would be entitled
to, in addition to the continuation of his annual consulting fee, three times
his annual consulting fee upon the date of such change in control (the APate agreement@); 

enter into an agreement with Postl providing that Postl would provide
consulting and advisory services to the company for the three-year period
following his termination and a consulting fee of $500,000 per year (the APostl agreement@); 

amend the company=s annual incentive plan (to provide
a full year of benefits in the event of a change in control) and long-term
incentive plan (payout of benefits upon a change in control); and

modify the definition of Achange-in-control.@

On March 7, 2002, Routs and Ron Blakely, Shell=s chief financial
officer, met with Postl and Tom Kellagher, Pennzoil=s chief financial
officer.  Postl reviewed Pennzoil=s publicly
available information with Routs and Blakely.  On March 8, 2002, Pennzoil and
Shell entered into a confidentiality agreement.  On March 13, 2002, Shell and
Pennzoil had a due diligence meeting.  On March 15, 2002, Routs called Postl to
tell him Shell was increasing its offer to $20 per share.  Postl responded that
he was not prepared to recommend $20 per share to the Pennzoil board.  








On March 18, 2002, Pennzoil=s board had a
telephonic meeting.  The board addressed the indictment of its independent
public accountants, Arthur Andersen, and the need to appoint other independent
public accountants.  Postl also informed the board Shell had indicated it was
prepared to increase its proposed price to $20 per share, the companies had
entered into a confidentiality agreement, and Pennzoil had retained Morgan
Stanley to assist in advising Pennzoil in connection with any potential
transaction.  Also, on March 18, 2002, a telephonic compensation committee
meeting was held, during which the committee approved recommending the granting
of stock options.  

On March 19, 2002, Routs and Postl met and agreed Shell=s and Pennzoil=s chief financial
officers would meet to go over the financial assumptions Shell would use to
prepare its final proposal.  Blakely and Kellagher met the afternoon of March
19.  

On March 22, 2002, Routs and Postl met.  They agreed this
would be the last attempt at negotiating an agreeable  sales prices.  Routs
offered $21.50, which Postl rejected.  Routs left the room for awhile and
conferred with Blakely.  Routs returned with a $22 per share offer, which Postl
said he would recommend to the Pennzoil board.  

Over the weekend, Shell learned of the change-in-control
benefits.  Routs was angry when he learned about the cost of the
change-in-control benefits.  The final cost of the change-in-control benefits
was substantially more than the amount Shell had estimated.  On the morning of
March 25, Routs called Postl, asking him to rescind the change-in-control
benefits.  Postl refused.  Routs considered terminating the transaction or
reducing the price, but Shell did neither.  On March 25, 2002, the Pennzoil
board met and voted to recommend to the shareholders the sale of the company to
Shell for $22 per share.  Shell issued a press release announcing the merger
agreement.  

On August 1, 2002, a shareholders meeting was held, at
which time 99% of Pennzoil=s voting shareholders approved the sale of
Pennzoil to Shell.[2] 
On October 1, 2002, Shell and Pennzoil completed the merger.  








Elloway alleges the price of $22 per share paid to the
shareholders was grossly inadequate and unfair.  Elloway asserts each of the
Directors breached their fiduciary duties of due care and loyalty under
Delaware law by failing to maximize shareholder value in connection with the
sale of Pennzoil.[3] 
The crux of Elloway=s complaint is the Directors agreed to the
unfair sale price to insure Shell would not walk away from the deal when it
learned of the cost of the increased benefits.  Elloway alleges the fact that
Shell was ready and willing to pay the additional amount for the
change-in-control benefits is evidence of the Acushion@ the Directors had
built into the $22 per share sale price, and the Directors should have obtained
the additional amount in the form of an increased price per share.  

Specifically,
Elloway alleges the Directors breached their fiduciary duties by: 

(1) failing to inform themselves of
all information reasonably available to them;

(2) granting to themselves, during
negotiations, substantial change in-control-benefits, which improperly
motivated them to push through the acquisition regardless of whether the price
was fair, and low-balling the sale price in order to build in a Acushion@ to cover the increased acquisition
cost resulting from the additional grants of change in control benefits; 

(3) failing to take steps to
maximize the value of Pennzoil by taking steps to avoid competitive bidding,
and failing to make good faith attempts to solicit other potential buyers;

(4) failing to properly value
Pennzoil; 

(5) failing to protect against the
numerous conflicts of interest resulting from their own interrelationships with
the transaction; and

(6) failing to disclose all
material information that would permit Pennzoil=s shareholders to
cast a fully informed vote.








After Elloway rested, the trial court granted the Directors= motion for a
directed verdict on Elloway=s due care claim.  The jury rejected
Elloway=s claims for
breach of the duty of disclosure and duty of loyalty.  The jury further found
the Pennzoil shareholders= vote approving the merger with Shell was
fully and fairly informed.  On December 15, 2005, the trial court entered a
take nothing judgment on Elloway=s claims against
the Directors.  

                                         Exculpatory Provision

In his first issue, Elloway complains the trial court erred
in granting a directed verdict on his due care claim.  Judgment without or
against a jury verdict is proper at any course of the proceedings only when the
law does not allow reasonable jurors to decide otherwise.  City of Keller v.
Wilson, 168 S.W.3d 802, 823 (Tex. 2005).  The test for legal sufficiency is
the same for directed verdicts and judgments notwithstanding the verdict.  Id. 
When reviewing the legal sufficiency of the evidence, we review the evidence in
the light most favorable to the challenged finding and indulge every reasonable
inference that would support it.  Id. at 822.  We credit favorable
evidence if reasonable fact finders could, and disregard contrary evidence unless
a reasonable fact finder could not.  Id. at 827.  The evidence is
legally sufficient if it would enable fair-minded people to reach the verdict
under review.  Id.  We must affirm the directed verdict if the record
establishes any ground that entitles the movant to judgment as a matter of law,
even if it was not raised in the motion.  Ibarra v. National Constr.
Rentals, Inc., 199 S.W.3d 32, 37 (Tex. App.CSan Antonio 2006,
no pet.); Westchester Fire Ins. Co. v. Admiral Ins. Co., 152 S.W.3d 172,
191 (Tex. App.CFort Worth 2004, pet. filed).  

The Directors
argue Elloway=s due care claims were negated by the exculpatory
provision in Pennzoil=s certificate of incorporation.  Under
Delaware law, a certificate of incorporation may contain:








A provision eliminating or limiting the personal liability of a
director to the corporation or its stockholders for monetary damages for breach
of fiduciary duty as a director, provided that such provision shall not
eliminate or limit the liability of a director:  (i) For any breach of the
director=s duty of loyalty
to the corporation or its stockholders; (ii) for acts or omissions not in good
faith or which involve intentional misconduct or a knowing violation of law; .
. . or (iv) for any transaction from which the director derived an improper
personal benefit. . . .

8 Del. Code ' 102(b)(7).  

With respect to
the limitation of the Directors= liability, Article IX of Pennzoil=s certificate of
incorporation provides, in relevant part:

A director of this
Corporation shall not be liable to the Corporation or its stockholders for
monetary damages for breach of fiduciary duty as a director, except to the
extent such exemption from liability or limitation thereof is not permitted
under the General Corporation Law as the same exists or may hereafter be
amended.  

The adoption of a charter provision, in accordance with
Section 102(b)(7), bars the recovery of monetary damages from directors for a
successful shareholder claim that is based on violations of the duty of care,
but not for violations of the fiduciary duties of loyalty or good faith.  Emerald
Partners v. Berlin, 787 A.2d 85, 90 (Del. 2001).  An exculpation clause
authorized by section 102(b)(7) is in the nature of an affirmative defense and,
therefore, the directors bear the burden to show they are entitled to its
protection.  In re Walt Disney Co. Deriv. Litig., 907 A.2d 693, 752
(Del. Ch. 2005), aff=d, 906 A.2d 27
(Del. 2006). 








In their answer, the Directors pleaded that Elloway=s claim for
monetary damages for any alleged breaches of the duty of care were barred by
the limitation of liability provision in Pennzoil=s certificate of
incorporation.  At the hearing on their motion for a directed verdict, the
Directors argued there was no evidence of gross negligence to support Elloway=s due care claim,
and the trial court granted the directed verdict on that basis.  The Directors
did not argue the exculpatory provision.  Elloway, therefore, contends the
Directors are forcing him to litigate the affirmative defense of section
102(b)(7) for the first time on appeal, particularly when the certificate of
incorporation was not in evidence at trial.  Elloway further complains there
were no jury findings, in accordance with section 102(b)(7), and all of the
Directors=s acts or omissions were in good faith and did not
involve intentional misconduct or a knowing violation of the law, which are
elements of proof under section 102(b)(7).  

The Directors
argue, given the jury=s unchallenged finding on loyalty and good
faith, there was nothing to submit to the jury.  Instructions to Question No.
4, the breach-of-loyalty question, state:  

The duty of loyalty requires a director to act in good faith, to make
informed decisions on behalf of the shareholders, rather than in their own
interests.  The best interests of the shareholders must take precedence over
any interest possessed by a director and not shared by the shareholders
generally.

The duty of loyalty also means
that, in a transaction involving the sale of a company, that [sic] the
directors have the duty to act reasonably to seek the highest value for the
stock reasonably obtainable.

The instructions accompanying Question No. 4 asked the jury
to determine whether each director had: (1) acted in good faith; (2) made
informed decisions on behalf of the shareholders; (3) acted in his or her own
interest; (4) acted so that the best interests of the shareholders took
precedence over any interest possessed by a director and not shared by the
shareholders generally; and (5) acted reasonably to seek the highest value
reasonably obtainable for the stock.  Additionally, in a preliminary
instruction, the jury was charged that the ADirectors have a
duty to inform themselves, prior to making a decision[,] of all material
information reasonably available to them.@  








A director=s duty in conducting a sale of the company
is to seek out, in a manner consistent with his or her fiduciary duties, Athe best value
reasonably available to the stockholders.@  In re Lukens,
Inc. S=holders Litig., 757 A.2d 720,
731 (Del. Ch. 1999). aff=d sub nom, Walker v.
Lukens, 757 A.2d 1278 (Del. 2000).  In a merger or sale, the director=s duty of care
requires the director, before voting on a proposed plan of merger or sale, to
inform himself and his fellow directors of all material information that is
reasonably available to them.  Cede & Co. v. Technicolor, Inc., 634
A.2d 345, 368 (Del. 1993), modified on other grounds, 636 A.2d 956 (Del.
1994).  

With respect to his due care claim, Elloway alleged the
Directors failed to properly inform themselves of all information, i.e., the
value of the change-in-control benefits and the financial health of the
company, available to them, which, in turn, tainted the negotiation process,
thus, preventing them from seeking the highest price reasonably obtainable. 
Because the elements of Elloway=s due care claim were submitted in
instructions accompanying the loyalty question and the jury=s negative answer
to the loyalty question, Elloway=s due care claim
was also necessarily rejected.  See Shupe v. Lingafelter, 192 S.W.3d
577, 580 (Tex. 2006) (per curiam) (holding jury=s negative finding
on negligence negated unsubmitted negligent entrustment issue as a matter of
law, rendering error, if any, in omission of instruction on negligent
entrustment harmless); Cooper v. Lyon Fin. Servs., Inc., 65 S.W.3d 197,
209 (Tex. App.CHouston [14th Dist.] 2001, no pet.) (holding, because
damages attributable to plaintiff=s breach of
warranty claims were the same as those for plaintiff=s DTPA claim, the
jury=s finding of no
damages on the DTPA claim rendered error, if any, in granting directed verdict
on plaintiff=s breach of warranty claims harmless). 

Elloway complains (1) the facts forming the basis of his
due care claim are different from those relating to the duty of loyalty claims,
and (2) there was no jury determination on damages for breach of the duty of
loyalty and, therefore, that basis for finding harmless error is absent here. 
To the contrary, many of the facts forming Elloway=s due care and
loyalty claims are the same.  In any event, the key point Elloway misses is the
elements of his due care claim were the same as those submitted to the jury on
his loyalty claim.  Elloway has not asserted that the instructions accompanying
the breach-of-loyalty issue were in any way incorrect.  








Moreover, Elloway did not present sufficient evidence.  Director
liability for breaching the duty of care is predicated on a showing of gross
negligence.  Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984), overruled
on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).  To overcome
the presumption that the Directors acted on an informed basis, Elloway must
show gross negligence.  Crescent/Mach I Partners, L.P. v. Turner, 846
A.2d 963, 985 (Del. Ch. 2000).  Gross negligence is a reckless indifference to
or a deliberate disregard of the whole body of stockholders or actions which
are without the bounds of reason.  Benihana of Tokyo, Inc. v. Benihana, Inc.,
891 A.2d 150, 192 (Del. Ch. 2005), aff=d, 906 A.2d 114
(Del. 2006).  

Elloway contends he produced substantial evidence the
Pennzoil board was recklessly informed about critical issues and acted outside
the bounds of reason.  Elloway first asserts the Directors, with the exception
of Pate and Postl, Awholly ignored the issue@ of synergies. 
Synergies are the aspects of the a merger that allow the acquiring company to
enhance its earnings, for example, by eliminating overlapping areas.  Elloway
alleges Pate, Postl, and Morgan Stanley concealed the value of the merger
synergies from the rest of the board.  Director Greeniaus testified that
someone said synergies were not relevant to the seller in the transaction.  

Morgan Stanley calculated the synergies of the merger.  At
its presentation to the board on March 25, Morgan Stanley did not include
synergies, although it did when it was working with Postl during negotiations
with Shell.[4] 
However, contrary to Elloways= allegation, Postl testified synergies
were reviewed with the board in terms of what Shell was prepared to pay.  








Elloway also asserts Postl and Pate concealed from the
remaining Directors how well Pennzoil was performing financially at the time of
the proposed transaction, and further that those Directors made no effort to
determine for themselves the company=s then current
performance.  According to one of Elloway=s expert
witnesses, Prof. Bernand Black, it was Pate=s and Postl=s responsibility
to give updated financials or projections to the other board members, but the
other board members still should, and could, have asked for that information.  

Again, contrary to Elloway=s assertion, the
minutes of the March 5, 2002 board meeting state Postl Aprovided a
projection of first quarter earnings and financial performance by each
business.@  Director Gerald Smith testified the board, at the
March 5 meeting, was told the first quarter looked promising, but two key areasCconsumer business
and international businessCwere not doing as well.  Also, Prof. Black
further stated, AI did not mean to convey the impression
that [the Directors] were unaware of how the company was doing.@  

Elloway further contends the Directors did not exercise Aan extra level of
care and attention@ in choosing a sales process to insure
they obtained Athe highest price . . . for the shareholders.@  Prof. Black
opined the board Ashould take overall charge . . . of the
major decisions that are going to be made; . . .@ such as
conducting an auction or looking for alternative buyers.  In documents prepared
for Pennzoil management for negotiation purposes, Morgan Stanley advised
Pennzoil management it had a fiduciary duty to shop the company to other
potential buyers in the absence of a public auction.  








Once the merger was announced, by definition, Pennzoil was
available and on the market.  No other companies approached Pennzoil interested
in a merger, and in the months following the announcement, Pennzoil=s stock never
traded at $22, but just below.  Postl testified the issue of other potential
buyers was discussed with the board, but it was concluded there were no other
credible buyers.  An auction is held when there is confidence that there is a
lot of interest and competition.  Here, with no other credible buyers, holding
an auction would not make sense.[5] 
Several witnesses testified that even when Pennzoil=s stock had fallen
to $9 or $10 the previous year, no one approached Pennzoil about buying the
company.[6] 
The duty to take reasonable steps to secure the highest immediately available
price does not invariably require the board to conduct an auction process or a
targeted market canvass because there is no single blueprint for fulfilling the
duty to maximize value.  In re Toys AR@ US, Inc. S=holder Litig., 877 A.2d 975,
1000 (Del. Ch. 2005); see also Crescent/Mach I Partners, L.P., 846 A.2d
at 985B86 (citations
omitted) (AGenerally, when a board of directors is considering a
single offer[,] fairness requires a canvass of the market to determine if
higher bids can be elicited.  However, if the directors possess a body of
reliable evidence with which to evaluate the fairness of the transaction[,]
they are permitted to approve the transaction without conducting a canvass of
the market.@).  

Elloway asserts
the Directors failed to inform themselves about the conflicts of interest
arising from the March 18 stock option grants.  The date for pricing the stock
option grants was March 18, which was trading considerably lower than the $20
offer then on the table.  Elloway further argues the trial court ignored the
evidence of insider trading as shown by the following exchange: 

Court:  You don=t have to repeat the facts.  How
does that rise to a level of gross negligence, which has been defined under
Delaware law as reckless indifference to or a deliberate disregard of the whole
body of stockholders or actions also which are without the bounds of reason? 
The testimony has been that it is routine for directors to increase their
compensation.

Plaintiff=s Counsel:  Not during the merger
negotiations, not at the time -- they went -- the stock options were being
granted as a result we are saying of insider trading.  I mean, if you are not
showing something that is consciously indifferent at this point, you have Shell
saying that this was insider trading.

Court:  If you will remember I
limined that out.  So that evidence is not in the record, that is insider
trading.








Elloway argues the trial court based its ruling on a
fundamental misunderstanding of the record when it believed no evidence that
the grant of stock options to top executives amounted to insider trading was in
the record.  Although the trial court had granted the Directors= motion in limine on
the issue of insider trading, Elloway asserts testimony regarding insider
trading came in without objection through Prof. Black, Brian Folely, another of
Elloway=s experts, and Ron
Blakely, Shell=s chief financial officer.  Elloway argues under the
trial court=s directed verdict analysis, proof of insider trading
was necessary to rebut a motion for directed verdict on the due care claims,
but the court simply ignored the evidence.  

The Directors respond that Elloway=s allegation of
insider trading is a mischaracterization of the record.  Prof. Black, Foley,
and Blakely[7]
testified if Pate and Postl had purchased stock on the public
market on March 18, with the knowledge that Shell had an offer on the table to
purchase the company, then there would be insider-trading implications.  There
was no testimony that the situation here was insider trading.  








Several witnesses testified Pennzoil had granted stock
options on an annual basis and, with the exception of the 2001 stock options,
Pennzoil usually granted those options in March.  Moreover, Director Terry
Savage, who was a member of the compensation committee, testified the process
for developing the list for options began before the February 22 overture by
Shell.  To grant stock options, the company had to determine how many options
it was going to grant.  Towers Perrin, Pennzoil=s outside
compensation consultant, performed that calculation.  Mark Esselman, senior
vice president of human resources at Pennzoil, explained he would make
recommendations to Postl regarding the allocation to each business unit by
looking at how many people at different levels each business unit had.  Charles
Essick of Towers Perrin testified February 2002 billings showed Towers Perrin
was involved in the March stock options grants.  

Furthermore, the stock options were company-wide, not just
for key executives.  The stock options were important because Pennzoil
employees had been working without pay raises.  When the options were granted,
Shell had increased its offer from $18.50 to $20 per share, which the Directors
felt was still inadequate.  The Directors testified they did not know, at that
time, if Shell would offer an acceptable price and a merger would be
accomplished.  Finally, Elloway=s argument to the trial court belies his
position on appeal that there was evidence of insider trading.  During the
hearing on the motion in limine, Elloway=s counsel stated, A[w]e=re just saying
that [granting the options] was like insider trading, that=s all we=re saying.  We=re not saying it
is insider trading.@  

Elloway also contends there was no consultation with Towers
Perrin regarding the March compensation amendments and such amendments were
approved in a hasty manner.  The process regarding the complained of
compensation changes, i.e., change-in-control benefits, started the previous
October, as stated in the minutes of the October 4, 2001 compensation committee
meeting and explained by the testimony of Director Savage, a member of the
compensation committee.  The minutes of the December 11, 2001 compensation
committee meeting reflect that Charles Essick of Towers Perrin participated in
that meeting and it was on the meeting=s agenda to review
and approve changes to the annual[8]
and long-term incentive plans.[9] 
With respect to Pate=s and Postl=s respective
consulting agreements, Towers Perrin was not involved.  Savage explained the
consulting agreements were not a question for Tower Perrin=s advice, but a
business decision of the compensation committee. 








Elloway complains, in assessing changes to Pate=s and Postl=s compensation
arrangements, the Directors did not assess the precise value of their existing
benefits in the event of a change in control against the precise value of the
purportedly new benefits.  Elloway alleges had the Directors asked, they would
have learned the improvements granted during the March 5 and March 18
compensation committee meetings and March 25 board meeting were $85 million.  Elloway
contends Shell would have paid more to the shareholders for the company,
instead of paying management for substantially increased change-in-control
benefits.  

Shell had estimated the total transaction cost for the
merger, including change-in-control benefits, was $20 million.  Between the
Friday Postl agreed to recommend the $22 offer to the board and Pennzoil=s Monday board
meeting, Shell learned of the amount of the change-in-control benefits exceeded
the amount it had estimated.  Routs and Blakely were angry about the increased
amount because they did not feel Postl had been forthcoming at the due
diligence meeting when the issue of change-in-control benefits came up.  The
morning of March 25, Routs called Postl, asking him to rescind the changes to
the change-in-control benefits.  Postl refused.  Routs had considered reducing
the per share purchase price or terminating the deal.  Shell=s lawyers advised
Routs the change was not material.  Shell did not reduce the $22 per share
price or walk away from the deal.  

Routs requested and received authority from Shell=s committee of
managing directors to negotiate with an offer of up to $20 per share, leaving
open the option that he could request an additional $2.  Routs did not have the
authority to offer more than $22, and Routs stated there were no circumstances
under which he would have gone back to the Shell=s board to ask for
authority to offer more than $22 per share.  Similarly, Lisa Davis, who led the
team that supported Shell=s negotiations, did not recommend that
Routs request authority to offer more than $22 per share because Pennzoil was
not worth more than that.  








Elloway also relies on figures contained in Pennzoil=s five-year
strategic plan, which had been in place since the summer of 2001, as evidence
the Directors did not seek the highest available price from Shell.  Postl
explained a strategic plan, by its nature, is optimistic, i.e., it assumes
success, and it is used to motivate the company=s employees.  The
plan, which was described as Avery aggressive,@ forecasted
Pennzoil=s stock would be
worth $25 by the end of 2005.  Several witness testified, however, to achieve
that price, every assumption in the plan would have to be met with no room for
risk or uncertainty.  As Director Gerald Smith explained, Aif all things went
according, the sun and moon and all the stars were aligned, there was a
possibility we could hit [the plan], but clearly [the plan] was aggressive and
optimistic.@  Similarly, Stephen Trauber of Morgan Stanley viewed
the plan as Aextraordinarily aggressive.@  

Pennzoil admitted to Blakely its five-year strategic plan Ahad some stretch
in it.@  Pennzoil
management viewed the chances of achieving the plan as A50/50.@  Blakely
testified Shell attributed more risk in the plan than Pennzoil had.  Pennzoil
management said the company was doing well as compared to the plan, but that
was not the basis on which Shell calculated long-term values.  Davis also
testified Shell viewed Pennzoil as a low-growth business, and believed the
strategic plan was very optimistic and it did not affect Shell=s valuation of
Pennzoil.  

The Directors testified they believed $22 per share was a
very good price for the company.  It represented a 55.5 percent premium over
Pennzoil=s stock=s trading price
four weeks prior to the announcement of the merger, a 42 percent premium over
Pennzoil=s trading price on
March 22Cthe day Routs and
Postl agreed to the $22 per share price, and a 33 percent premium over Pennziol=s all-time high
trading price of $16.50 per share.[10] 









Also, Pennzoil had not been operating without problems. 
Two major components in achieving the strategic plan were the growth and
success of Pennzoil=s consumer business and international
business.  The previous year, Pennzoil had cut it=s investment grade
dividend by 80 percent so it could invest more in the company..  Pennzoil=s stock fell to
around $9 or $10 per share.  Pennzoil=s investment
rating was downgraded, making it more expensive to borrow money, and more
expensive and difficult to raise capital to invest in and expand its consumer
and international businesses.  Pennzoil had a strong position in the lube
market, but that market was shrinking and it had significant competition.  

Finally, as Director Smith testified, he was a shareholder
with no stock options, so his position was the same as that of any other
shareholder.  Because the board members were paid a fee for serving as
directors, if they had really wanted to take a position to advance their alleged
self-interests, they would have kept the company going to continue receiving
their fees.  

Elloway also alleges the Directors failed to disclose
certain information in the Proxy so the shareholders could make an informed
vote on the merger.  Elloway asserts the Directors failed to disclose (1)
Morgan Stanley=s estimated synergies were not part of its
presentation to the board; (2) Pennzoil=s internal
earnings estimates exceeded those of Wall Street analysts; (3) management
requested, in March, and received additional change-in-control benefits
totaling $84.9 million; (4) additional change-in-control benefits were not
disclosed to Shell until after the $22 price had been agreed upon; and (5)
stock options were granted when Shell=s $20-offer was
pending.  Elloway also complains the Proxy misrepresented that executive
benefits were vetted by Towers Perrin, and understated the total change-in-control
benefits received by top executives by $4 million.  








The Proxy informed shareholders that Pennzoil=s directors had
been named in two lawsuits filed on March 28, 2002, and April 4, 2002, seeking
class certification on behalf of Pennzoil shareholders.  The Proxy explained
the petitions alleged the directors had breached their fiduciary duties in
connection with the proposed sale of Pennzoil to Shell at a price alleged to be
grossly inadequate and unfair.  The petitions further alleged the directors
derived unspecified personal financial benefits from the acquisition at the
expense of Pennzoil=s shareholders.  Finally, the Proxy gave
the styles and cause numbers of the two lawsuits, which sought to enjoin the
sale of Pennzoil to Shell.  

Moreover, these are essentially the same complaints Elloway
raises with regard to either the concealment of information from the Directors
or the Directors= failure to inform themselves which are
without merit.  We conclude Elloway has not presented evidence that the
Directors= conduct constitutes gross negligence.  Elloway=s first issue is
overruled.  

                                              Jury Instruction

In his second issue, Elloway contends the trial court
submitted an irrelevant affirmative defense to the jury in the form of a
prefatory instruction.  We review a trial court=s decision to
submit or refuse a particular instruction under an abuse of discretion
standard.  Shupe, 192 S.W.3d at 579.  An abuse of discretion occurs when
the trial court acts without reference to guiding principles.  Texas Dep=t of Human Servs.
v. E.B., 802 S.W.2d 647, 649 (Tex. 1990).  The jury should not be burdened
with surplus instructions.  Acord v. General Motors Corp., 669 S.W.2d
111, 116 (Tex. 1984).

The complained of
prefatory instruction states:  

A director may rely in good faith
upon the records of the corporation and such information, opinions, reports or
statements presented to the corporation by any of the corporation=s officers or
employees, or committees of the board of directors, or by any other person as
to matters the director reasonably believes are within such other person=s professional or
expert competence and who has been selected with reasonable care by or on behalf
of the corporation, but a director may not avoid his or her active and direct
duty of oversight in connection with the merger.  Directors have a duty to
inform themselves, prior to making a decision of all material information
reasonably available to them.








The prefatory
instruction is derived from 8 Del. Code
' 141 (e), which
states:

A member of the
board of directors, or a member of any committee designated by the board of
directors, shall, in the performance of such member=s duties, be fully
protected in relying in good faith upon the records of the corporation and upon
such information, opinions, reports or statements presented to the corporation
by any of the corporation=s officers or employees, or committees of
the board of directors, or by any other person as to matters the member
reasonably believes are within such other person=s professional or
expert competence and who has been selected with reasonable care by or on
behalf of the corporation.

8 Del. Code ' 141(e).

Elloway complains the instruction is an affirmative
defense.[11] 
Elloway contends, by including the instruction as a prefatory instruction, the
trial court, in effect, granted a directed verdict on the Directors= good faith
defense to his loyalty and non-disclosure claims relieving them of the burden
of proving their defense.  The Directors, on the other hand, contend section
141(e) is generally not considered to be an affirmative defense under Delaware
law, but is a presumption or a factor to be applied to a variety of inquiries
under Delaware law.[12]
For reasons explained below, we need not determine whether section 141(e) is an
affirmative defense because error, if any, in the submission of it as a
prefatory instruction was harmless. 








Elloway next maintains section 141(e) is applicable only to
his breach of care claims, not his breach of loyalty claims.  See, e.g.,
Crescent/Mach I Partners, L.P., 846 A.2d at 985 (stating section 141(e)
provides directors are protected from a breach of the duty of care).  Elloway
argues the protections afforded by section 141(e) do not apply on its face
because a breach of the duty of loyalty occurs when a director is acting in his
own self interest, not for the benefit of the corporation.  Therefore,
according to Elloway, the trial court should not have submitted the section
141(e) instruction in light of the directed verdict granted on his claims for
breach of the duty of care.  Elloway relies on Levermann v. Cartall,
which held the prefatory instruction was improperly included in the court=s charge because
it Adid not refer to
any particular issue or term used in the charge and could only be considered by
the jury as applying to the case as a whole.@  393 S.W.2d 931,
935 (Tex. Civ. App.CSan Antonio 1965, writ ref=d n.r.e.).

The Directors assert Levemann is not applicable
because the prefatory instruction here was not superfluous because section
141(e) is not limited to due care claims, but is relevant to the claims
submitted to the jury.  See, e.g., McMillian, 768 A.2d at 505 n.55
(stating board=s reliance on investment banker is another factor
weighing against the plaintiffs= ability to state actionable claim that
the directors breached their duty of loyalty for failure to secure highest
value reasonably attainable); Cinerama, Inc. v. Technicolor, Inc., 663
A.2d 1156, 1175 (Del. 1995) (noting board=s reliance on
reports by investment firms and experienced counsel as evidence of good faith
and overall fairness of process of merger); In re W. Nat=l Corp. S=holders Litig., No. 15927, 2000
WL 710192, at *23 (Del. Ch. May 22, 2000) (holding committee could and did
reasonably rely on its expert advisor determining whether special committee was
fully and fairly informed); In re RJR Nabisco, Inc. S=holder Litig., No. CIV. A.
10389, 1989 WL 7036, at *16 (Del. Ch. Jan. 31, 1989) (stating special committee
appropriately relied on financial advisors finding it acted good faith). 
Delaware courts have applied section 141(e) when considering claims other than
breach of the duty of due care.  We reject Elloway=s contention.  








Finally, Elloway complains the Delaware Supreme Court has
held this affirmative defense is unavailable as a matter of law Awhen a board is
deceived by those who will gain from such misconduct.@  Mills
Acquisition Co. v. MacMillan, 559 A.2d 1261, 1284 (Del 1989).  Elloway
asserts he has adduced substantial evidence that Postl and Pate deceived the
Directors by concealing material information regarding merger-related synergies
and Pennzoil=s updated positive financials.  

In Mills, two members of senior management (chairman
and chief executive officer, and president and chief operating officer) of the
acquired company would have had a substantial ownership in the new company.  Id.
at 1272.  While the board was under the impression that the bids to acquire the
company were the result of a fair and unbiased auction process, the chairman
and president both remained silent, concealing from the other directors their
misconduct during the auction to skew the result.  Id. at 1277.  The
court determined there was no board planning and oversight to insulate the self-interested
management from improper access to the bidding process.  Id. at 1282.  

The facts in this case are distinguishable from the
egregious facts in Mills.  As the Directors point out, this case does
not involve any directors who had an interest in, or stood to acquire an
interest in, the acquiring company by virtue of the merger, i.e., there is no
evidence Pate or Postl stood on both sides of the transaction.  Instead, Pate=s and Postl=s alleged
interests were the change-in-control benefits and stock option grants.  Simply
because a director stands to gain financially through change-in-control
benefits does not mean the director has a financial interest in the merger so
that the board may not delegate negotiating authority to that director.  Cf.
Wisconsin Inv. Bd. v. Bartlett, No. C.A. 17727, 2000 WL 238026, at *6 (Del.
Ch. Feb. 24, 2000) (holding, unlike Mills, it was within board=s business
judgment to delegate authority to director to negotiate the merger,
incentivized by a fee tied to the best result he could obtain for all
shareholders).  

It was within the board=s business
judgment to delegate authority to Postl to negotiate with Shell.  There is no
evidence (1) the Directors completely abdicated their responsibility of
oversight of the negotiations to Postl and Morgan Stanley; (2) Pate or Postl
controlled the rest of the Directors; or (3) Pate and Postl concealed certain
information such as merger-related synergies or Pennzoil=s financial status
for the first quarter of 2002 from the rest of the Directors.  








The prefatory instruction not only tracks the language of
section 141(e), but also contains the following additional language from Mills,
Aa director may not
avoid his or her active and direct duty of oversight in connection with the
merger.  Directors have a duty to inform themselves, prior to making a decision
of all material information reasonably available to them.@  Thus, the jury
was instructed the directors still had the responsibility of oversight of the
negotiation process and informing themselves of all material information
reasonably available to them.  

Elloway has not demonstrated that error, if any, in
submitting the section 141(e) instruction as a prefatory instruction, that
probably caused the rendition of an improper judgment.  Tex. R. App. P. 44(a)(1); Wal-Mart
Stores, Inc. v. Johnson, 106 S.W.3d 718, 723 (Tex. 2003).  Elloway=s second issue is
overruled.  

                         Comment on the Weight of the Evidence

In his third issue, Elloway complains the trial court
commented on the weight of the evidence.  A trial judge=s statement during
the course of trial impermissibly comments on the weight of the evidence if A>it indicates the
judge=s opinion
concerning a matter to be determined by the jury.=@  In re M.E.C.,
66 S.W.3d 449, 458 (Tex. App.CWaco 2001, no pet.) (quoting Knoll v.
Neblett, 966 S.W.2d 622, 640 (Tex. App.CHouston [14th
Dist.] 1998, pet. denied)).  We review a trial judge=s purportedly
improper comments as a matter of law.  In re Commitment of Barbee, 192
S.W.3d 835, 847 (Tex. App.CBeaumont 2006, no pet.).  The complaining
party must first show the comment was improper and second that the improper
comment prejudiced the complaining party.  Id. at 847 (citing Metzger
v. Sebeck, 892 S.W.2d 20, 39 (Tex. App.CHouston [1st
Dist.] 1994, writ denied)). 

Elloway asserts
the trial court improperly commented on the weight of the evidence when it
referred to Shell as Ajust a witness@ during voir
dire.  During voir dire, immediately after asking the voir dire panel whether
anyone knew Elloway or any of his attorneys, Elloway=s attorney stated:









One of the things
that this case involves is a transaction between Shell and Pennzoil.  One of
the things that you=re going to hear about is Shell=s side of the
story.  You are going to hear the Shell executives talk about their view of
this transaction.  Is their anybody here that has worked for Shell or has had a
family member that worked for Shell?  

Elloway=s attorney then
proceeded to question a number of prospective jurors about their respective
relationship with Shell and any potential bias in favor of, or against, Shell. 
The trial court asked Elloway=s attorney to approach the bench where an
unrecorded conference was held.  Elloway=s attorney then
stated to the voir dire panel:

Again, and just so that it is clear because the court wants to make
sure I was being clear, is that Shell witnesses will testify in this case. 
Now, there will be people who negotiated the transaction.  There will be people
at very high levels in Shell.  And I am concerned that you might lean in favor
or give greater weight to the testimony of somebody from Shell because of your
experience with Shell, and if you do I just need for you to tell me that that
might be some that you -- 

Elloway=s attorney then
continued to question potential jurors about their relationships with Shell. 
The Directors= attorney eventually spoke up that Shell was not a
party and following exchange occurred:

MR. MALONEY [Pennzoil=s counsel]:  Your Honor, this is
not necessarily an objection.  I think this panel needs to understand that
Shell is not being sued here.

                                                    *       
*        *

MR. MALONEY:  I think that is an
important point.  It does sound like Shell is a defendant.

THE COURT:  Mr. Thompson [Elloway=s counsel], I would like you to
make clear to the jury panel that Shell is not a defendant, to the extent that
you=ve been asking these questions,
they are just a witness.

MR. THOMPSON [Elloway=s counsel]:  Shell is not a
defendant in this case; . . .

                                                    *       
*        *








MR. THOMPSON: 
Although Shell is not a defendant in this case, the issue in this case is
whether or not the transaction where Shell purchased Pennzoil-Quaker State was
a fair deal for the shareholders.  That is what this is about.  

Elloway contends Shell was not just a witness, but was the
real party in interest because it had indemnified the Directors and was liable
for any judgment against Pennzoil.

          To
preserve error for appeal, the party must object when the comment occurs and
request an instruction unless proper instructions cannot render the comment
harmless.  In re Commitment of Barbee, 192 S.W.3d at 847 (citing Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam)). 
Elloway failed to object to the trial court=s comment and to
request an instruction.  Therefore, he has waived this issue on appeal.  

Moreover, even if Elloway had not waived this issue, we
conclude the trial court did not comment on the weight of the evidence because
Shell=s indemnification
agreement with Pennzoil was not an issue that was to be submitted to the jury. 
See M.E.C., 66 S.W.3d at 458 (explaining the trial court impermissibly
comments on the weight of the evidence if it concerns a matter to be determined
by the jury).  In any event, Elloway was permitted to question the panel
extensively about their potential bias for or against Shell.  Moreover, even if
the trial court=s comment could be construed as a comment
on the weight of the evidence, the impression that Shell was a witness free
from any bias or interest in the case was cured by Rout=s admission that
Shell had a potential financial interest in the outcome of the case.  Elloway=s third issue is
overruled.  

                                                      Standing

In a final issue raised by the Directors, they assert the
merger eliminated Elloway=s Pennzoil stock ownership and, therefore,
his standing to maintain a derivative claim on behalf of Pennzoil was
extinguished upon merger.  








A derivative claim is brought by a stockholder, on behalf
of the corporation, to recover harm done to the corporation.  Tooley v.
Donaldson, Lufkin & Jenrette, 845 A.2d 1031, 1036 (Del. 2004).  A
stockholder=s direct claim must be independent of any alleged
injury to the corporation.  Id. at 1039.  If the stockholder=s claim is
derivative, the stockholder loses standing to pursue his claim upon
accomplishment of the merger.  Parnes v. Bally Entm=t Corp., 722 A.2d 1243,
1244B45 (Del. 1999).  A
stockholder who directly attacks the fairness or validity of a merger alleges
an injury to the stockholders, not the corporation, and may pursue such claim
even after the merger at issue has been consummated.  Id. at 1245.  To
state a direct claim with respect to a merger, a stockholder must challenge the
validity of the merger itself, usually by charging the directors with breaches
of fiduciary duty in unfair dealing and/or unfair price.  Id. at 1245.  

The Directors filed a motion to dismiss for lack of subject
matter jurisdiction arguing Elloway could not bring a stockholder=s derivative suit
because such suit belonged to the corporation and no longer existed.  Pate,
2003 WL 22682422, at *1.  The trial court denied the Directors= motion to dismiss
and entered an order permitting the Directors to pursue an interlocutory appeal
under Section 51.014(d) of the Texas Civil Practice & Remedies Code.[13] 
Pate, 2003 WL 22682422, at *1.  The First Court of Appeals concluded
Elloway had challenged the fairness of the merger, thereby stating a direct
claim, and affirmed the trial court=s order.  Id.
at *3.[14] 
The Texas Supreme Court denied the Directors= petition for
review.  








In this appeal, the Directors reassert Elloway=s purported lack
of standing, arguing the evidence presented at trial shows Elloway=s claims were
derivative, i.e., wasting corporate assets.  We disagree.  At trial Elloway
clearly was trying make the case that the Directors had breached their
fiduciary duties, resulting in their failure to seeking and obtain the highest
price reasonably available.  That he was not able to produce sufficient
evidence of those alleged breaches does not mean he lacks standing.  The
Directors= issue is overruled.  

Accordingly, the judgment of the trial court is affirmed.  

 

 

 

 

 

/s/      J. Harvey Hudson

Senior Justice

 

 

 

 

Judgment rendered
and Opinion filed November 1, 2007.

Panel consists of
Justices Yates and Anderson, and Senior Justice Hudson.*









[1]  Companies often enter into agreements with their
executives in anticipation of a change in control to retain key employees
during the uncertainty of a potential merger or acquisition. Such agreements
are referred to as change-in-control agreements or so‑called Agolden parachute@
agreements.  Linda E. Rappaport,
Achieving Synergies in High Tech Transactions: The People Factor, 985
PLI/Corp 73, at 76 (Apr. 1997).





[2]  On June 17, 2002, there were outstanding 80,602,689
shares of common stock.





[3]  The trial court granted Elloway=s request for class certification.  The First Court of
Appeals affirmed the class certification order.  Pate v. Elloway, No.
01-03-00187-CV, 2003 WL 22682422 (Tex. App.CHouston
[1st Dist.] Nov. 13, 2003, pet. denied).  





[4]  Stephen Trauber of Morgan Stanley explained
synergies would not be helpful in assessing the fairness of the transaction,
but would be helpful to assess how much Shell could afford to pay for the
company and to try to negotiate a higher purchase price.  





[5]  Stephen Trauber of Morgan Stanley similarly
testified his team looked at a wide range of companies that might have a
strategic interest in Pennzoil, ranging from consumer companies to automotive
type companies.  Morgan Stanley concluded there were no other likely buyers for
Pennzoil for a number of reasons, including lack of a strategic fit or
antitrust issues.  With no other serious buyer, it made no sense to hold an
auction.  Morgan Stanley discussed this with the board.  





[6]  Routs testified, when Pennzoil stock was trading at
$9 or $10, Shell was prohibited by contractual arrangements with Texaco from
acquiring another oil company.  Shell viewed this as a missed opportunity.





[7]  However, Blakely, as well as  Lisa Davis, who led
the team supporting the negotiations, testified Shell was aware of the March
stock option grants and understood the grants were made annually, were part of
Pennzoil=s normal course of business, and were granted on a
company-wide basis, not just for key executives.  





[8]  Thousands of employees are included in the annual
incentive plan.  Bonuses had not been paid out the year before under the annual
incentive plan.  





[9]  There were about 50 participants in the long-term
incentive plan.  





[10]  In the AStatement
of Facts@ section of his appellate brief, Elloway includes a
discussion of a 1998 attempted hostile takeover of Pennzoil by Union Pacific
Resources (AUPR@), apparently
in support of his position that the $22 per share price was inadequate. 
According to Elloway, the board rejected an offer equivalent to $40 per share
for Pennzoil=s lubricants/consumer products division.  Gerald
Smith, who was on the board at the time, explained the board rejected the offer
because the UPR transaction was not an all‑cash transaction like the
Shell transaction, UPR was highly leveraged and was not a triple rated company,
and it was questionable whether UPR could even go through with transaction.  





[11]  See, e.g., Manzo v. Rite Aid Corp., No. Civ.
A. 18451-NC, 2002 WL 31926606, at *3 n.7 (Del. Ch. Dec. 19, 2002) (stating Athe protections of '
141(e) would constitute an affirmative defense for which evidence may be
brought at trial@).  





[12]  See, e.g., McMillian v. Intercargo Corp., 768
A.2d 492, 505 n.55 (Del. Ch. 2000) (citing section 141(e) as a Afactor@ weighing
against claims for breach of the duty of loyalty).  





[13]  Tex. Civ.
Prac. & Rem. Code Ann. '
51.014(d) (Vernon Supp. 2006).  





[14]   Reviewing the petition, the First Court of Appeals
noted Elloway alleged the merger had occurred by an unfair process that
resulted in an inadequate price, and the Directors had breached their fiduciary
duties by failing to maximize shareholder value, failing to provide fair and
full disclosure of all material information related to the merger, doing
virtually no preparation or due diligence, using an outdated strategic plan,
approving Shell=s offer without shopping the company to other
prospective buyers or undertaking a market check, and granting new benefits
while merge negotiations were taking place, giving them an incentive to approve
the merger rather than seek a more favorable price for the shareholders.  Pate,
2003 WL 22682422, at *3.  





*  Senior Justice J. Harvey Hudson sitting by
assignment.